IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Civil No. 4:20-cv-00180 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | VERIFIED COMPLAINT FOR |
| | ) | FORFEITURE *IN REM* |
| $7,041.00 IN U.S. CURRENCY, | ) | |
| MORE OR LESS, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, United States of America hereby files and serves this VERIFIED
COMPLAINT IN REM and alleges as follows:

## I.     NATURE OF THE ACTION

1.     This is an action to forfeit and condemn specific property ("Defendant
property") to the use and benefit of the United States of America ("Plaintiff") for
involvement, as set forth below, in violations of 21 U.S.C. § 846 (attempt and
conspiracy) and § 841(a)(1) (prohibited acts).

2.     The United States believes the Defendant property is subject to
forfeiture pursuant to 21 U.S.C. § 881(a)(6), as money or a thing of value furnished
or intended to be furnished by a person in exchange for a controlled substance, in
violation of subchapter I – Control and Enforcement, of  Chapter 13 – Drug Abuse
Prevention and Control, and Title 21 – Food and Drugs, of the United States Code,
and proceeds traceable to such an exchange, and money used or intended to be used
to facilitate any violation of said subchapter.

## II.   DEFENDANT *IN REM*

3.   The Defendant property is generally described as approximately $7,041.00 in U.S. currency seized in the Southern District of Iowa in February 2017, as discussed more fully below.  The Defendant property is in the custody of the City of Clive Police Department.

## III.   JURISDICTION AND VENUE

4.   This Court has jurisdiction over this case, pursuant to 28 U.S.C. Section 1345 (United States as plaintiff), as an action commenced by the United States of America, and pursuant to 28 U.S.C. Section 1355(a) (Fine, penalty, or forfeiture), as an action for forfeiture.

5.   This Court has in rem jurisdiction and venue over the Defendant property, pursuant to 28 U.S.C. Sections 1355(b) (Fine, penalty, or forfeiture) and 1395(b) (Fine, penalty, or forfeiture), because acts or omissions giving rise to the forfeiture occurred in this district and because the Defendant property was seized from and is located in this district.

## IV.   FACTS

6.   The AControlled Substances Act@ was enacted by Congress as Title II of the AComprehensive Drug Abuse Prevention and Control Act of 1970,@ Pub.L. No. 91-513, 84 Stat. 1236 (1970) (codified at 21 U.S.C.  §§ 801-904).

7.   The term "controlled substance" is defined in 21 U.S.C. § 802(6) to mean a drug or other substance, or immediate precursor, included in any of the five schedules of such substances set forth in subchapter I of Title 21.

8.      Schedule I substances have a high potential for abuse, have no currently accepted medical use in treatment in the United States, and there is a lack of accepted safety for use of these controlled substances under medical supervision. 21 U.S.C. § 812(b)(1)(A) – (C).

9.      Schedule II substances have a high potential for abuse, the controlled substances have a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions, but use of a Schedule II controlled substance may lead to severe psychological or physical dependence 21 U.S.C. § 812(b)(2)(A) – (C).

10.     Schedule III substances have a potential for abuse less than the substances in Schedules I and II, have a currently accepted medical use for treatment in the United States, but abuse of the controlled substances may lead to a moderate or low physical dependence or high psychological dependence. 21 U.S.C. § 812(b)(3)(A) – (C).

11.     Schedule IV controlled substances have a low potential for abuse relative to the controlled substances in Scheduled I – III, have a currently accepted medical use in treatment in the United States, but abuse of the controlled substances may lead to limited physical dependence or psychological dependence relative to the controlled substances in Schedule III. 21 U.S.C. § 812(b)(4)(A) – (C).

12.     Schedule V controlled substances have a low potential for abuse relative to the substances in the preceding schedules, have a currently accepted medical use for treatment in the United States, but  abuse of the controlled substances may lead

to limited physical dependence or psychological dependence relative to the controlled substances in Schedule IV. 21 U.S.C. § 812(b)(5)(A) – (C).

13.     Heroin is an opioid drug made from morphine, a natural substance taken from the seed pod of the various opium poppy plants grown in Southeast and Southwest Asia, Mexico, and Colombia. Heroin can be a white or brown powder, or a black sticky substance known as black tar heroin. Other common names for heroin include *big H*, *horse*, *hell dust*, and *smack*. People inject, sniff, snort, or smoke heroin.

14.     Heroin enters the brain rapidly and binds to opioid receptors on cells located in many areas, especially those involved in feelings of pain and pleasure and in controlling heart rate, sleeping, and breathing. When people overdose on heroin, their breathing often slows or stops. This can decrease the amount of oxygen that reaches the brain, a condition called *hypoxia*. Hypoxia can have short- and long-term mental effects and effects on the nervous system, including coma and permanent brain damage.

15.     Under the Controlled Substances Act, it is unlawful to distribute, dispense, or possess with intent to distribute a controlled substance, unless authorized by law to do so.  21 U.S.C. § 841(a)(1).

16.     It is illegal, under federal law, to conspire with other people to sell and/or distribute controlled substances to others in exchange for money. 21 U.S.C. § 846.

17.     Under the Controlled Substances Act, it is unlawful to conspire with others to violate its prohibitions.  21 U.S.C. § 846.

4

18.   Heroin (Schedule I) is a controlled substance under the Controlled Substances Act, and it is illegal for a person to possess and distribute it in the United States.

19.   It is believed that evidence will show, or will show after a reasonable opportunity for further investigation and discovery, that the Defendant property constituted the proceeds of prohibited controlled substance offenses, or was used or intended to be used to facilitate a prohibited controlled substance offense, namely the distribution of heroin in the Southern District of Iowa.

20.   The profits from the illegal distribution of controlled substances are forfeitable under federal law, as are all moneys used or intended to be used to facilitate any federal controlled substance offense.

21.   In approximately 2016 and 2017, if not earlier, Bruce Edward McGee, Artelliuos Demond Young, Jr., Charles Junior Sims, Andrew Juno Shannon-Dickens, Bernard Calvin Stigler, Sr., and George Lamar Stigler, and others, conspired to distribute heroin in the Southern District of Iowa.

22.   The individuals mentioned in the foregoing paragraph were charged on February 24, 2017 in the U.S. District Court for the Southern District of Iowa with distributing heroin and related charges.

23.   On or about February 24, 2017, Bruce Edward McGee, Artelliuos Demond Young, Jr., Charles Junior Sims, Andrew Juno Shannon-Dickens, Bernard Calvin Stigler, Sr,, and George Lamar Stigler were indicted in the U.S. District Court

for the Southern District of Iowa on charges related to the illegal possession and distribution of heroin.

24.    On April 10, 2017, Bruce Edward McGee ("McGee") pled guilty in the U.S. District Court for the Southern District of Iowa to distribution of heroin, and was later sentenced on August 24, 2017 to 13 months' imprisonment.

25.    On April 10, 2017, Artelliuos Demond Young, Jr. ("Young") pled guilty in the U.S. District Court for the Southern District of Iowa to distribution of heroin, and later sentenced on August 24, 2017 to 10 months' imprisonment.

26.    On April 14, 2017, Charles Junior Sims pled guilty in the U.S. District Court for the Southern District of Iowa to possession with the intent to distribute heroin, and was later sentenced on August 25, 2017 to 16 months' imprisonment.

27.    On April 14, 2017, Andrew Juno Shannon-Dickens pled guilty in the U.S. District Court for the Southern District of Iowa to possession with the intent to distribute heroin, and later sentenced on August 25, 2017 to 12 months' imprisonment.

28.    On April 7, 2017, Bernard Calvin Stigler, Sr. ("Bernard Stigler") pled guilty in the U.S. District Court for the Southern District of Iowa to distribution of heroin, and was sentenced on July 19, 2017 to 15 months' imprisonment.

29.    On April 7, 2017, George Lamar Stigler ("George Stigler") pled guilty in the U.S. District Court for the Southern District of Iowa to distribution of heroin, and was sentenced on July 19, 2017 to 15 months' imprisonment.

6

30.   The funds involved in this case stem from the investigation that led to the above-referenced guilty pleas and convictions.

31.   It is believed members of the conspiracy travelled to Chicago on a regular basis to purchase heroin for resale in the Des Moines area.

32.   On December 7, 2016, December 15, 2016, January 3, 2017, January 19, 2017, and February 1, 2017, Sims sold heroin to individuals who then or later cooperated with law enforcement.

33.   Evidence gathered by law enforcement in December 2016 showed McGee then resided at times at his mother's residence of 1530 16th Street, Des Moines, Iowa, as well as at 2400 Hickman Road, Apartment 6, Des Moines, Iowa.

34.   Other evidence gathered by law enforcement in December 2016 showed McGee was using sandwich-sized baggies, and'/or parts thereof, to package heroin.

35.   Drug-dealers often use clear plastic baggies, or portions thereof, such as the cut-off corners, to package illegal controlled substances.

36.   On January 6, 2017, a confidential informant working with law enforcement purchased one (1) gram of heroin from McGee, which McGee had stored at his apartment in the parking lot of a local business.

37.   After the drug deal discussed in the preceding paragraph, law enforcement watched McGee engage in another hand-to-hand drug transaction in the same parking lot, with a different customer.

38.   On January 6, 2017, law enforcement gathered evidence that had been discarded in the trash at 1530 16th Street, Des Moines, and found baggies with

marijuana residue, burnt blunts (or hollowed out cigars filled with marijuana), and a broken glass pipe with marijuana residue.

39.     On January 18, 2017, a confidential informant working with law enforcement purchased approximately four (4) to five (5) grams of heroin from McGee in his apartment, after meeting outside 2400 Hickman Road, Des Moines with Young, who accompanied the confidential informant inside.

40.     During this transaction, McGee showed the confidential informant a rifle he then possessed.

41.     Drug-dealer are known to carry firearms, or to have firearms near them, to protect their drugs, their drug-money, and themselves from acts of robbery or violence.

42.     On January 10, 2017, Young sold approximately one (1) gram of heroin to a confidential informant in Des Moines, Iowa.

43.     On January 23, 2017, a confidential informant working with law enforcement arranged a purchase of heroin with McGee, and then purchased approximately four (4) to five (5) grams of heroin from Young at 1530 16th Street, Des Moines, the residence of McGee's mother, and of Bernard Calvin Stigler, Sr., McGee's maternal half-brother and co-conspirator.

44.     On January 26, 2017 and January 30, 2017, Bernard Calvin Stigler, Sr, sold approximately one (1) gram portions of heroin to a confidential informant in Des Moines, Iowa.

45.     On January 30, 2017, George Stigler sold approximately one (1) gram of heroin to a confidential informant in the Des Moines area.

46.     On February 3, 2017, a valid federal search warrant was executed at 2400 Hickman Road, Apartment 6, Des Moines, Iowa otherwise known as McGee's residence/apartment.

47.     Present inside the residence/apartment were McGee, Young, a female ("H.A.") and two small children.

48.     Law enforcement located three (3) or four (4) bindles of heroin on Young, who declined to speak with law enforcement.

49.     During the search, law enforcement found $7,041.00 in U.S. Currency and a firearm.

50.     Drug-dealers generally engaged in drug-transactions on a cash basis, which makes it more difficult for law enforcement and others to learn of their suspicious and illegal activities.

51.     McGee and his associates sold heroin on a cash basis.

52.     McGee's employment history is poor, and he did not make enough income from legitimate sources over the years to acquire $7,041.00.

53.     Evidence supports the contention that this $7,041.00 is the proceeds of heroin sales, or money intended to be used to purchase heroin, or both, by McGee and/or other members of the conspiracy.

54.     Other evidence seized from the residence included a black digital scale with drug residue, another black digital scale, clear plastic baggies (apparently used for drug-trafficking), another digital scale, McGee's cell phone, and other items.

55.     Drug-dealers often use digital scales to weigh their product before packaging it and selling it to customers.

56.     After being advised of his *Miranda* rights, McGee consented verbally to be interviewed.

57.     During his post-*Miranda* interview, McGee chose not to respond when asked if the U.S. Currency in the house belonged to him.

58.     McGee told law enforcement they would have to wait and see who was going to take the weight for the firearm.

59.     McGee, however, said he was going to be "solid" and not "crack" and did not provide any information to law enforcement.

60.     McGee stated he was not going to do more than five (5) years in prison for the three heroin buys.

61.     McGee said nothing was in the apartment, because law enforcement came on the wrong day.

62.     McGee told law enforcement he did not have a job.

63.     McGee later told law enforcement the money seized was not drug money, stating "it was savings money" like from his girl who "gets disability and shit."

64.     At one point, McGee added none of the money belonged to H.A., but later he said "the bulk" of the money did not belong to her.

10

65.     McGee eventually elected to decline to answer the question based on his Fifth Amendment right against self-incrimination when asked if the seized money belonged to him.

66.     McGee said if law enforcement had executed the search warrant on a different day, they would not need to ask him any questions because they would have caught him "in action" and it would "all be right there."

67.     McGee told law enforcement he had not seen "that much" heroin, and he did not know from where it was imported.

68.     McGee later told law enforcement if his uncle, Kurt Williams, did not take responsibility for the firearm in the apartment, then he would do so.

69.     Also on February 3, 2017, law enforcement executed a search warrant at 1530 16th Street, Des Moines, Iowa the other location connected to McGee's heroin-dealing.

70.     Co-conspirator Bernard Stigler was present when the search warrant was executed, as were numerous other individuals.

71.     During the search of 1530 16th Street, Des Moines, Iowa law enforcement found 1.3 grams of heroin, 6.7 grams of marijuana, four digital scales, a marijuana grinder, and numerous firearms and ammunition.

72.     The conspirators distributed at least 113.4 grams of heroin.

### V.  COUNT ONE – DEFENDANT $7,041.00
### (FORFEITURE UNDER 21 U.S.C. ' 881(a)(6))

73.     Plaintiff repeats and realleges each and every allegation set forth above.

11

74.    The United States has reason to believe the Defendant property constitutes moneys or other things of value furnished or intended to be furnished in exchange for a controlled substance, and/or were used or intended to be used to facilitate one or more violations of 21 U.S.C. § 841 and § 846 et seq.

75.    As a result of the foregoing, the Defendant property is liable to condemnation and to forfeiture to the United States for its use, in accordance with 21 U.S.C. § 881(a)(6).

## VI.   CONCLUSION

WHEREFORE, the plaintiff requests that the Court issue a warrant for the arrest and seizure of the Defendant property, that the Defendant property be forfeited to the United States, and that it be awarded its costs and disbursements in this action, and such other and further relief as the Court deems proper and just under the facts and applicable law.

Respectfully submitted,

Marc Krickbaum
United States Attorney

By:  */s/ Craig Peyton Gaumer*
Craig Peyton Gaumer
Assistant United States Attorney
U. S. Courthouse Annex, #286
110 East Court Avenue
Des Moines, Iowa 50309
Tel: (515) 473-9317
Fax: (515) 473-9292
Email: craig.gaumer@usdoj.gov

## VERIFICATION

I, Brian Kempnich, hereby verify and declare under penalty of perjury that I am a police officer with the City of Clive Police Department and that I have read the foregoing Verified Complaint *in Rem*, and know the contents thereof and the matters contained in the Verified Complaint are true to my own knowledge, except for those matters not within my own personal knowledge and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds for my belief are the official files and records of the United States and information provided to me by other law enforcement officers, as well as my investigation of this case, together with others, as a police officer with the City of Clive Police Department.

Dated:  June 7, 2020.

Brian Kempnich, Officer
City of Clive Police Department